IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 14-cv-002162-LTB

AUGUST CLIFFORD SANDERS,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

_____

ORDER
_____

Plaintiff, August Clifford Sanders, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§401-433, and his application for supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§1381-1383c. Jurisdiction is proper under 42 U.S.C. §405(g). Oral argument would not materially assist me in the determination of this appeal. After consideration of the parties' briefs, as well as the administrative record, I REVERSE AND REMAND the Commissioner's final order for further proceedings.

## I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying his applications for disability insurance benefits and for supplemental security income filed on May 23, 2011. [Administrative Record ("AR")140-8, 187] After the applications were initially denied on September 6, 2011 [AR 91-4], an Administrative Law Judge ("ALJ") conducted an evidentiary

hearing on October 12, 2012, and issued a written ruling on November 5, 2012 [AR 18-27] The ALJ denied Plaintiff's applications on the basis that he was not disabled because he was capable of performing work that exists in the national economy (Step Five). [AR 26-7] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 6-10] Plaintiff timely filed his complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on February 25, 1994, was thirty-four years old at the time of his alleged disability onset date of October 1, 2009, and thirty-seven at the administrative hearing. [AR 20, 38] He had graduated from high school, attended one year of college and had about one year of vocational training as an electrician. [AR 40-41] His past relevant work history was as a carpet cleaner, and then as a sales representative for a construction company. [AR 41-42] Finally, after his onset date, he made several unsuccessful attempts at a home telemarketing business. [AR 155, 41] In his applications, Plaintiff alleged he became disabled on October 1, 2009, due to a neck and thoracic spine injury, chronic pain and a panic disorder. [AR 38, 45, 142] Plaintiff initially injured his neck/upper back in 2003 while working as a carpet cleaner. [AR 43, 192, 206] A 2004 cervical MRI revealed mild degenerative spondylosis with disc space narrowing and desiccation in Plaintiff's cervical spine – but no significant dural, sac, cord or root encroachment – with disc bulges from the C-3 through C-7 levels. [AR 249]

On October 1, 2009 (Plaintiff's claimed onset date), Plaintiff's treating physician, Michael Holder, M.D., indicated Plaintiff had previously reported increasing symptoms of

depression and sadness, in addition to his anxiety/panic, sometime in August 2009. [AR 245]  In early 2010, Kimberly Winter, M.D., became his treating physician, and continued to manage his chronic pain and anxiety medication. [AR 243-44]

In August 2011, Claudia Elsner, M.D., performed a physical consultive examination of Plaintiff. [AR 233-36]  Dr. Elsner reported no abnormal physical findings and her "mini" mental status examination was normal. [AR 233-35]  Based on Plaintiff's complaints that his panic attacks kept him from working, Dr. Elsner felt "strongly" that Plaintiff needed access to medical care, a psychiatric evaluation, and medication for his mental health issues in order to be able to work. [AR 235]

At that time Plaintiff also saw Aimee Henley, Ph.D, who performed a consultive psychological evaluation. [AR 237-41] At that examination Plaintiff reported panic attacks primarily when leaving his home to travel by car and that he had trouble making plans because he worried about having a panic attack. [AR 237]  He also reported that he had done "irrational things," but denied having depression, and he endorsed social isolation, and sleeping poorly. [AR 237]  Dr. Henley diagnosed Plaintiff with a panic disorder with agoraphobia, pain disorder associated with psychological factors and a general medical condition, and history of substance abuse. [AR 240]  She assessed a Global Assessment of Functioning (GAF) score of 45. [AR 240] Dr. Henley concluded that Plaintiff displayed mild cognitive impairments; mild impairment of persistence and pace; mild to moderate impairment of attention and concentration; moderate impairment of ability to adapt to change; significantly impaired ability to cope with additional stress; and was "likely unable to work successfully with others because he cannot leave his home." [AR 240]

In August of 2001, the state agency psychologist reviewed Plaintiff's medical records and concluded that his anxiety-related condition was mild to moderate, and that he has the ability to do simple basic work in a nonpublic setting. [AR 67-71]

At the hearing, Plaintiff testified that his neck pain was aggravated by walking, bending, turning, and moving around. [AR 50] He estimated that he could sit for 45 minutes to an hour and then would have to get up, and he could stand for about 10 minutes and walk for about 20 minutes to one-half hour. [AR 51] He indicated that could lift, but not for a long time or repetitively. [AR 51] In order to manage his pain, Plaintiff takes medications and has tried physical therapy, a TENS unit, hypnosis, meditation and yoga, and at-home physical therapy equipment. [AR 47-48]

He also testified that he has difficulty traveling to places, but he could travel if he finds someone to drive him, or takes a bus if he can get on, and if he takes enough medication. [AR 41] He had difficulty with being in a vehicle for more than ten minutes. [AR 48] Plaintiff indicated that he spends his day by taking his medication, reading, doing physical therapy exercises, watching television, and spending time with his father. [AR 52] He can make a simple meal for himself, and tries to do dishes, wash laundry, and take out the trash. He does not mop or vacuum very often, and does not do any household repairs or yard work. [AR 52-53] He also tries to attend church every week, and can use a computer for an hour or two. [AR 54]

His father then testified about Plaintiff's problems traveling in a vehicle [AR 56-57], and a vocational expert also testified. [AR 59-60]

### III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the

burden to demonstrate that the claimant has the residual functional capacity to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 1, 2009 (Step One). [AR 20]  The ALJ further determined that Plaintiff had the severe physical and mental impairments of degenerative disc disease of the cervical spine, panic disorder with agoraphobia, pain disorder and substance abuse in remission (Step Two), but that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 20]

The ALJ then determined that Plaintiff retained the ability to perform a range of sedentary work  except that he can only occasionally reach overhead. While he can frequently handle, finger and feel, he cannot climb ladders or scaffolds.  He can only occasionally kneel and crawl and he cannot work at unprotected heights, with moving mechanical parts, or with vibrating tools.  He is limited to unskilled work with a maximum specific vocational preparation (SVP) of 2, and he can have no more than occasional interaction with supervisors, co-worker and the public. [AR 22]  Based on this residual functional capacity ("RFC") assessment – as well as testimony from the vocational expert and Plaintiff's age, education, work experience – the ALJ determined that jobs exist in significant numbers in the national economy that Plaintiff can perform. [AR 25-6]  As such, the ALJ found that Plaintiff was not disabled at Step Five of the sequential evaluation process and, therefore, was not under disability as defined by the SSA. [AR 26-7]

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision of the SSA Commissioner is supported by substantial evidence in the record as a whole and whether correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000). Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987)(*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)). I may not re-weigh the evidence or substitute my judgment for that of the ALJ. *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981). With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

Because it is dispositive of this appeal, I first address Plaintiff's contention that this matter should be remanded for additional consideration because the ALJ failed to properly develop the record. I agree that missing medical records need to be obtained, if available, and

the ALJ should reconsider her decision in light of those records. Specifically, Plaintiff – who was acting *pro se* at the administrative hearing – asserts that the record does not contain the following: medical records from Plaintiff's treating sources after March 2011 through the date of the hearing in October 2012; a treatment note dated sometime around August of 2009 from his physician Dr. Michael Holder; and the results of a cervical spine x-ray ordered by Dr. Claudia Elsner in 2011.

A social security disability hearing is non-adversarial with the ALJ responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997)(*citations omitted*); *see also* 20 U.S.C. §423(d)(5)(B). "Although a claimant has the burden of providing medical evidence proving disability, the ALJ has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Carter v. Chater*, 73 F.3d 1019, 1021 (10th Cir. 1996)(*quoting Baca v. Department of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993)). This means that "the ALJ has the duty to obtain pertinent, available medical records which come to his [or her] attention during the course of the hearing." *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006)(*quoting Carter v. Chater*, *supra*, 73 F.3d at 1022). Moreover, the ALJ's duty is heightened when a claimant appears before the ALJ without counsel. *Madrid v. Barnhart*, *supra*, 447 F.3d at 790 (*quoting Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993)). "However, a claimant's *pro se* status does not, in and of itself, mandate a reversal." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)(*citing Born v. Secretary of Health & Human Servs.*, 923 F.2d 1168, 1172 (6th Cir. 1990)).

I first note that the record is clear that Plaintiff acted *pro se* during his administrative

hearing. At the hearing the ALJ asked Plaintiff if he understood that he could be represented, and indicated that they could postpone the hearing so that he could obtain representation. [AR 35-6] The ALJ advised Plaintiff that it is a representative's job, among other things, "to obtain all of your medical evidence and make sure that . . . it is in the file before the hearing for my review." [AR 36] Plaintiff responded that he "would like to proceed" without representation. [AR 36]

The record then reveals that after admitting additional records provided by Plaintiff, dated March of 2011, the ALJ asked Plaintiff if he had seen any medical providers since that time. [AR 38] Plaintiff responded, "Yes, only for typical checkups on medication . . . [b]ut nothing due to the injury and the panic disorder has remained the same so I have not had any new diagnoses, if that is what you are asking." [AR 38] Based on this exchange, I reject Plaintiff's contention that the ALJ's failure to obtain these treatment record, under these circumstances, constitutes a failure of her duty to obtain pertinent, available medical records in light of Plaintiff's unambiguous assertion on the record that they would not be relevant. *See Madrid v. Barnhart, supra*, 447 F.3d at 792 (ruling the ALJ did not commit legal error by failing to request treatment notes or records generated eight month prior to the hearing as such claim of error "is simply too general; we do not know if the records he thinks the ALJ should have obtained are pertinent or available")(*citing Carter v. Chater*, *supra*, 73 F.3d at 1022).

I likewise conclude that ALJ's alleged failure to seek a potential missing treatment note from sometime in August of 2009 does not constitute a breach of her duty to obtain known, available and pertinent medical records. In claiming the existence of this record, Plaintiff refers to a treatment note from Dr. Michael Holder, dated October 1, 2009, in which he indicated that

"after I last saw [Plaintiff] 2 mos. ago, [he] started developing a lot of depressive and sadness symptoms." [AR 245]  It appears, however, that there is no record of this visit – which apparently occurred two months earlier in August of 2009 – contained in the administrative record in this case.  Because there is no direct evidence that the record exists or was relative and pertinent to the issues decided by the ALJ and, more importantly, there is no indication that the ALJ was aware of its possible existence, I find no legal error in the ALJ's "failure" to attempt to obtain it.  *See Carter v. Chater*, *supra*, 73 F.3d at 1022 (defining the ALJ's duty as to obtain pertinent, available medical records "which come to his [or her] attention during the course of the hearing").

Finally, Plaintiff contends that the ALJ failed to obtain or consider a cervical spine x-ray apparently done sometime after it was ordered in August of 2011.  The records show that during his consultive examination with Dr. Claudia Elsner on August 9, 2011, Plaintiff reported four herniated discs in the cervical vertebrae following his injury in 2003, and he complained of chronic upper back pain. [AR 233]  As such, Dr. Elsner indicated that Plaintiff "on repeated question, confirms that he does not have lower back pains" and thus she "asked [that] the L-spine film will be changed to a C-spine film  . . .  due to the above history." [AR 235]

At the hearing, the ALJ asked Plaintiff if he had any objections to the admission of the exhibits in the matter, including the medical records.  Plaintiff responded that because he was late to the hearing, he was unable to review the entire disc containing the documents. [AR 37]  At the end of the ALJ's questioning of Plaintiff, she asked if there was anything else that he would like to her to know about "why you're unable to work now."  Plaintiff responded that "[o]ne thing concerns me is the original time that I was denied the documentation came back . . .

10

he didn't seem to have my cervical spine listed and you obviously do now." Plaintiff further indicated that "[a]nd if you have all my, if you have all of my information and everything then I think that's – ." [AR 55-6]

The ALJ subsequently ruled, in her order, that Plaintiff suffers from the severe impairment of degenerative disc disease of the cervical spine. [AR 20]  In assessing his RFC, she determined Plaintiff's history for treatment of his physical ailments was "limited," and that while he complained of severe neck pain "MRIs have shown no more than mild degenerative spondylosis with no significant dural, sac, cord or root encroachment." [AR 23]  In support of this finding, the ALJ quoted the results from an MRI report dated May 21, 2004. [AR 247]  The ALJ also noted that Dr. Elsner's consultive exam in August of 2011 showed no abnormalities, that his coordination and gait were normal, and that his musculoskeletal examination proved symmetric and healthy with normal range of motion. [AR 233-7]

The Commissioner argues that because Dr. Elsner concluded that Plaintiff had no physical limitations, based on her examination, the results of a subsequent cervical spine x-ray would not have altered that conclusion.  And, as such, there is no indication that the MRI results could change the outcome of this case as the ALJ's assessment was of Plaintiff's functional limitations, as opposed to his symptoms. I disagree.  To the extent that a MRI report from 2011 exists – as apparently ordered by Dr. Elsner as a consultive examiner – I find that the ALJ should have been aware of its existence and that such record would be pertinent and relevant to the assessment of Plaintiff's claimed functional limitations. Although it is clearly Plaintiff's duty to prove the alleged disability, *Carter v. Chater*, *supra*, 73 F.3d at 1021,  I conclude that in this case the ALJ should have sought out the existence and availability of the 2011 MRI report ordered by

the consultive examiner. *See Madrid v. Barnhart*, *supra*, 447 F.3d at 790; *Henrie v. U.S. States Dep't of Health & Human Servs.*, *supra*, 13 F.3d at 361.

On remand of this matter, in addition to addressing Plaintiff's 2011 MRI results, if available, the ALJ should address an apparent inconsistency in the testimony of the vocational expert – who indicated that a person with Plaintiff's RFC could perform an addressing clerk job (DOT 209.587-010) – with the ALJ's ruling that Plaintiff's RFC would allow him to perform the job of a routing clerk (DOT 222.687-022). [AR 26]  And, to the extent that Plaintiff contends that the ALJ's RFC findings were not supported by substantial evidence, or that his alleged obesity further limits his functioning, such arguments may also be addressed on remand.

ACCORDINGLY, for the foregoing reasons, I REVERSE AND REMAND the Commissioner's final order pursuant to sentence four of 42 U.S.C. §405(g) for further proceedings consistent with this order.

Dated: February  18 , 2016 in Denver, Colorado.

                                                    BY THE COURT:


                                                     s/Lewis T. Babcock
                                                    LEWIS T. BABCOCK, JUDGE